1  Jay T. Jambeck, SBN # 226018
   *jjambeck@leighlawgroup.com*
2  Mandy G. Leigh, SBN # 225748
   *mleigh@leighlawgroup.com*
3  Damien B. Troutman, SBN # 286616
   *dtroutman@leighlawgroup.com*
4  LEIGH LAW GROUP, P.C.
   582 Market Street, Suite 905
5  San Francisco, CA  94104
   Telephone: 415-399-9155
6  Facsimile: 415-795-3733

7  Attorneys for Plaintiff,
   GREGORY and JULIE APPLING,
8  on behalf of their minor child K.A.

9
                  **UNITED STATES DISTRICT COURT**
10                **NORTHERN DISTRICT OF CALIFORNIA**

11

12  GREGORY and JULIE APPLING,                    )  **Case No.:**
    on behalf of their minor child K.A.,          )
13                                                )
                                                  )  **COMPLAINT FOR DAMAGES,**
14                                                )  **DECLARATORY AND INJUNCTIVE**
                                                  )  **RELIEF:**
15              Plaintiff,                         )
                                                  )
16        v.                                       )  1. **STAY PUT UNDER THE**
                                                  )     **INDIVIDUALS WITH**
17                                                )     **DISABILITIES EDUCATION ACT**
                                                  )     **(20 U.S.C. § 1415(j)**
18  CREDO HIGH SCHOOL, an                         )  2. **DENIAL OF PROCEDURAL**
    independent charter school,                   )     **SAFEGUARDS (20 U.S.C. § 1415);**
19                                                )  3. **RETALIATION AND**
                                                  )     **INTIMIDATION (Title V of the ADA,**
20              Defendant.                         )     **42 U.S.C. § 12203; Section 504, 29**
                                                  )     **U.S.C. § 794);**
21                                                )  4. **CONSTITUTIONAL**
                                                  )     **DEPRIVATION (42 U.S.C. § 1983 –**
22                                                )     **14th Amendment);**
                                                  )  5. **NEGLIGENT SUPERVISION AND**
23                                                )     **TRAINING**
                                                  )
24                                                )
                                                  )
25                                                )
                                                  )  **JURY TRIAL DEMANDED**
26                                                )
                                                  )
27                                                )
                                                  )

                                              1
                                          **COMPLAINT**

Plaintiff K.A. ("Plaintiff" or "K.A."), a minor, by and through his Parents and Guardians ad Litem GREGORY and JULIE APPLING (collectively, "Parents"), files this Complaint against Defendants CREDO HIGH SCHOOL ("Credo") and alleges the following:

## INTRODUCTION

1.    This action seeks emergency injunctive and declaratory relief to preserve the educational placement and federal rights of K.A., a 15-year-old student with autism and various serious mental health disorders who is enrolled at Credo High School, a California independent charter school.

2.    Credo unlawfully disenrolled K.A. on September 3, 2025, under the pretext of "non-residency," after having already extended his suspension and recommended expulsion for alleged behavioral incidents. Credo later attempted to cure its violations by scheduling a Manifestation Determination Review ("MDR") for October 14, 2025, a date when the family and their experts were unavailable, and refused to reschedule.

3.    These actions violated the stay-put provision of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(j); deprived Plaintiffs of their constitutional right to due process under *Goss v. Lopez*, 419 U.S. 565 (1975); and constituted retaliation and intimidation in violation of Title V of the ADA, 42 U.S.C. § 12203, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

4.    Plaintiffs therefore seek a temporary restraining order and injunctive relief requiring Credo to maintain K.A.'s last agreed-upon educational placement and to cease retaliatory or intimidating conduct.

5.    Plaintiff also seeks damages pursuant to 42 U.S.C. § 1983 for constitutional deprivation of property interest under the 14th amendment to the United States Constitution and for the negligent training and supervision of Credo special education employees.

## PARTIES AND JURISDICTION

6.    Plaintiffs Gregory and Julie Appling are the parents of K.A., a minor, and reside in Sebastopol, Sonoma County, California.

7.     Defendant Credo High School is a California public charter school receiving federal funds within the meaning of Section 504, 29 U.S.C. § 794(b).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction under 28 U.S.C. § 1331, 20 U.S.C. § 1415(i)(2)(A), 28 U.S.C. § 1331, 42 U.S.C. § 1983 and 28 U.S.C. § 1343(a)(3).

9.     Venue lies in this District under 28 U.S.C. § 1391(b) because Credo High School operates in Sonoma County, California, within the San Francisco Division of the Northern District of California.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

10.     K.A. is eligible for special-education and related services under the IDEA due to Autism and Other Health Impairment.

11.     In March 2024, psychoeducational/IEP records documented Plaintiff with Autism and Other Health Impairment (OHI), with significant anxiety/depression, executive-function deficits, social-communication impairments, sensory regulation needs, and emotional dysregulation requiring Educationally Related Mental Health Services (ERMHS), a functional behavioral approach, and safety supports.

12.     Plaintiff's December 2024 Functional Behavior Assessment identified long-standing rigidity, perseveration on perceived fairness, low frustration tolerance, and sensory/environmental triggers—each impacting peer interactions, classroom behavior, and access to curriculum.

13.     On July 24, 2025, during a therapy session, K.A. voiced hypothetical ideation in response to a clinician's prompt. The Sheriff issued an informational report and coordinated a next-day MST/W&I § 5585 evaluation; there was no emergency custody. Parents implemented home safety measures and promptly informed Credo; releases were signed for provider communications.

14.     On August 12, 2025, Credo executed a Safety Plan addendum identifying "homicidal ideation (thoughts) and mental graphic images," listing "thoughts/images of blood" as warning signs, and specifying triggers including perceived rudeness and peer rejection, to be addressed through coordinated supports with ERMHS.

15.     Credo noticed an "Amendment IEP" for August 21, 2025, without any suspension agenda. Minutes before the meeting, Credo inserted "disciplinary proceedings," then issued a 4.5-day suspension inside the IEP—justifying it as "marking parameters." Parents received suspension paperwork for the first time at this IEP. The Parents were unable to confer with K.A. and adequately respond to the allegations, nor was the IEP facilitated in a way to allow for any substantive response.

16.     On August 26, 2025, Credo extended K.A.'s suspension and recommended expulsion based on allegedly new evidence and disruptive behavior. No notice or opportunity to be heard was provided for the new suspension. K.A. was not attending school at the time of the second suspension.  These actions were disciplinary in nature and constituted a decision to change placement under 34 C.F.R. § 300.530(e).

17.     On September 3, 2025, Credo disenrolled K.A., claiming "residency/medical withdrawal" while simultaneously pursuing expulsion. This disenrollment was a continuation of the disciplinary removal, not a neutral administrative act. The disenrollment has not been rescinded by Credo.

18.     Credo's "non-residency" justification was false. K.A. remained domiciled with his parents in Sebastopol. His temporary evaluation in Utah was part of a Home-Hospital Instruction ("HHI") service period authorized by his IEP team. Under Cal. Educ. Code § 48200, a child's school residency follows the parent's residence; temporary medical or therapeutic absences do not terminate enrollment. *See Taylor v. Honig*, 910 F.2d 627 (9th Cir. 1990).

19.     By disenrolling K.A. without a timely manifestation determination, Credo unilaterally changed placement in violation of 20 U.S.C. § 1415(j) and 34 C.F.R. § 300.530(e).

20.     On September 8, 2025, the Parents filed a compliance complaint with the California Department of Education (CDE) challenging the unlawful disenrollment.

21.     The next day, Credo attempted to convene an immediate Manifestation Determination Review (MDR) in order to justify its disenrollment of K.A. and threatened to proceed without the family. Through counsel, the Parents agreed by consent to extend the ten-day MDR timeline, on the condition that Credo provide mutually agreeable dates.

22.     Credo then unilaterally scheduled the MDR for October 14, 2025, despite written notice that neither the Parents nor their experts were available, and refused all requests to reschedule. Credo also noticed an expulsion hearing for October 21, 2025.

23.     Because the sole basis for extending the ten-day deadline was mutual consent, Credo's refusal to coordinate scheduling revoked that consent, rendering the MDR untimely under 34 C.F.R. § 300.530(e).

24.     On October 14, 2025, Plaintiffs filed a due-process complaint with the California Office of Administrative Hearings (OAH Case No. TBD[1]) alleging denial of FAPE, improper disciplinary removal, procedural violations, and retaliation. A true and correct copy of the OAH complaint is attached hereto as Exhibit A.

25.     Credo's continued insistence on holding the October 14 MDR in the family's absence—after these complaints were filed—constitutes retaliation and intimidation for asserting protected rights.

26.     On October 14, 2025, counsel for Plaintiff, Mandy Leigh, appeared at the MDR , without parents or experts who were unavailable, and attempted to read portions of expert reports into the record. Defendant refused to discuss Plaimtiff's history nor behaviors, cut off counsel for the Applings by muting her on videoconference, stated they would not consider further information from the Plaintiff's counsel, threatened to countersue Plaintiff's counsel personally, all for the purpose of intimidating and retaliating against Plaintiff's family and counsel for advocating on behalf of Plaintiff.

---

[1] OAH does not issue case numbers until the time of its scheduling order which has not yet issued.

**COMPLAINT**

1

2       27.     Credo has already pre-decided that the behaviors at issue are not a manifestation of

3 Plaintiff's disabling condition and have determined to expel him to justify their previous illegal

4 disenrollment of K.A.

5       28.     The family has received no *Goss v. Lopez* due-process notice or hearing for any of

6 the suspensions or removals of K.A.

7       29.     K.A. currently receives no educational services consistent with his IEP and is

8 experiencing severe anxiety and regression.

9
### FIRST CAUSE OF ACTION
10
**Violation of IDEA "Stay-Put" (20 U.S.C. § 1415(j))**

11       30.     Plaintiff realleges and incorporates herein by reference each and every allegation

12 set forth in paragraphs 1-29 above.

13

14       31.     Credo's disenrollment and attempted expulsion changed K.A.'s placement without

15 parental agreement or due-process hearing, violating § 1415(j) and *Honig v. Doe*, 484 U.S. 305

16 (1988).

17       32.     Plaintiffs are entitled to injunctive relief restoring and maintaining K.A.'s last

18 agreed-upon educational placement pending completion of due-process proceedings.

19
### SECOND CAUSE OF ACTION
20
**Denial of Procedural Safeguards and Parental Participation**
21
**(IDEA and 34 C.F.R. §§ 300.322, 300.530)**

22       33.     Plaintiff realleges and incorporates herein by reference each and every allegation

23 set forth in paragraphs 1-29 above.

24       34.     Credo failed to convene an MDR within ten school days of its disciplinary decision

25 and excluded the Parents and their experts from meaningful participation.

26

27

35.     The time for an MDR was extended by consent of the Plaintiff's family in order to schedule a mutually agreed upon date and time. Because Credo has refused to schedule a mutually agreed upon date and time, Plaintiff has revoked agreement that the MDR is timely.

36.     Credo's conduct violated the IDEA's procedural safeguards, 34 C.F.R. §300.530(e)(1) and 34 C.F.R. §§300.322(a)–(c).

37.     As a result, the MDR and disciplinary proceedings are invalid, and Credo must be enjoined from expelling Plaintiff.

<u>**THIRD CAUSE OF ACTION**</u>

**Retaliation and Intimidation**

**(Title V of the ADA, 42 U.S.C. § 12203; Section 504, 29 U.S.C. § 794)**

38.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1-29 above.

39.     Plaintiffs engaged in protected activity by filing a CDE complaint, invoking counsel, and submitting a due-process complaint.

40.     Credo responded by:

a. Scheduling the MDR on a date known to exclude the family and experts;

b. Threatening to proceed in their absence; and

c. Continuing expulsion efforts to coerce withdrawal of complaints;

d. Holding the MDR and refusing to consider Parents' counsel's input and threatening lawsuits against counsel instead.

41.     Such conduct constitutes retaliation and intimidation prohibited by 42 U.S.C. § 12203(a), 29 U.S.C. § 794, 28 C.F.R. § 35.134(a), and 34 C.F.R. § 104.61.

42.     Plaintiffs seek injunctive relief under 42 U.S.C. §12133 to prohibit further retaliatory or intimidating actions and to enjoin Credo from holding an MDR without parent participation at a mutually agreeable date and time or expelling Plaintiff.

**FOURTH CAUSE OF ACTION**

**Constitutional Deprivation – 14th Amendment**

**(42 U.S.C. § 1983)**

43.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1-29 above.

44.    At all relevant times, Defendants acted under color of state law as employees of Credo High School, a public charter school organized and operated under California law, acting in the public function of determining services and status of a student.

45.    Plaintiffs possessed clearly established constitutional and statutory rights, including:

(a) the right to procedural due process in educational disciplinary proceedings under the Fourteenth Amendment to the United States Constitution and *Goss v. Lopez*, 419 U.S. 565 (1975).

46.    Defendant, through its agents, pursuant to official policy, custom, or practice, intentionally or recklessly violated these rights by:

(a) pretextually disenrolling K.A. on September 3 2025 under a pretext of "non-residency" after initiating disciplinary proceedings;

(b) failing to provide notice and an opportunity to be heard before suspension, disenrollment, and expulsion.

47.    Suspension and expulsion exercise of state power affecting a student's constitutional property and liberty interests in public education.

48.    These actions deprived Plaintiffs of liberty and property interests in K.A.'s public education without due process of law and interfered with rights secured by the Constitution and federal statutes.

49.    As a direct and proximate result of these actions, Plaintiffs suffered deprivation of federally protected rights, emotional distress, and loss of educational opportunity.

50.    Plaintiffs seek declaratory and injunctive relief, compensatory damages, attorney's fees under 42 U.S.C. § 1988, and such further relief as the Court deems just and proper.

**FOURTH CAUSE OF ACTION**

**Negligent Training and Supervision**

51.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1-29 above.

52.     At all relevant times, Defendant Credo High School owed a duty to properly supervise, train, and monitor its administrative personnel, including its Special Education Director and other staff responsible for implementing IDEA and Section 504 procedures.

53.     Credo breached that duty by failing to adequately train and supervise staff regarding manifestation determinations, disciplinary procedures for students with disabilities, and parental participation requirements under the IDEA.

54.     Credo knew or should have known that its Special Education Director and other staff were inadequately trained and that their actions, including the unlawful disenrollment of K.A., failure to convene a timely MDR, and coercive scheduling of disciplinary proceedings, posed a foreseeable risk of harm to Plaintiffs.

55.     As a direct and proximate result of Defendant's negligence, Plaintiffs suffered harm, including educational deprivation, emotional distress, and the costs of pursuing administrative and judicial relief.

56.     Defendant's negligence occurred within the course and scope of employment, and Credo High School is vicariously liable for its employees' acts and omissions under Gov. Code § 815.2(a).

57.     Plaintiffs seek compensatory damages in an amount to be proven at trial and all other relief as the Court deems just.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for the following:

1.     Injunctive relief, including:

    a.   Stay-put: Plaintiff's placement at HHI be maintained until Plaintiff is released from treatment by his doctor and then placement at Credo;

    b.   enjoining Credo from expelling Plaintiff;

    c.   enjoining Credo from further acts of retaliation and intimidation against the Plaintiff, Plaintiff's family and counsel for Plaintiff;

2.    declaratory relief that any decision made at an MDR without parent participation is without legal effect;

3.    Reasonable attorneys' fees and costs, to the extent permitted by law;

4.    All other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff demands a jury on all issues and all causes of action where afforded by right.

Dated: October 14, 2025

**LEIGH LAW GROUP, P.C.**

/s/ Jay T. Jambeck

Jay T. Jambeck
Attorney for Plaintiff

## VERIFICATION

I, Julie Appling, declare under penalty of perjury under the laws of the United States of America that the foregoing allegations set forth in this complaint are true and correct.

Dated: October 14, 2025

Julie Appling

EXHIBIT A

Mandy G. Leigh, SBN # 225748
Jay T. Jambeck, SBN # 226018
Damien B. Troutman, SBN # 286616
**LEIGH LAW GROUP, P.C.**
582 Market Street, Suite 905
San Francisco, CA 94104
Telephone: 415-399-9155
Facsimile: 415-795-3733
E-mail: mleigh@leighlawgroup.com
Email: dtroutman@leighlawgroup.com

*Attorney for Petitioners*

## BEFORE THE OFFICE OF ADMINISTRATIVE HEARINGS

## SPECIAL EDUCATION DIVISION

| | |
|---|---|
| ALIERA "KYLO" APPLING, Student, by and through his Parents, JULIE APPLING and GREGORY APPLING, <br><br> Petitioners, <br><br> v. <br><br><br> CREDO HIGH SCHOOL, <br><br> Respondent. | **Case No.:** N/A <br><br> **REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION** <br><br> **[34 C.F.R. § 300.532(a)]** <br><br><br> ***EXPEDITED HEARING REQUESTED*** |

1

*REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION*
*APPLING v. CREDO HIGH SCHOOL*

## I.    NOTICE OF REPRESENTATION

Student ALIERA "KYLO" APPLING ("Kylo" or "Student") and Parents GREGORY APPLING and JULIE APPLING ("Mr. Appling" and ("Mrs. Appling," respectively; collectively, "Parents"; together with Kylo, "Petitioners") are represented by Mandy G. Leigh, Esq. and Damien B. Troutman, Esq. of the LEIGH LAW GROUP, P.C. in the above-captioned matter. Please address all further communications in this matter accordingly.

## II.    INTRODUCTION

This is a request for a due process proceeding and mediation pursuant to 20 U.S.C. § 1415, *et seq*. and founded upon the facts set forth below, and others that will be presented at the hearing in this matter, demonstrating that Respondent CREDO HIGH SCHOOL ("Credo" or "Charter") has denied Petitioners a free and appropriate public education ("FAPE") under the relevant statutory period set forth by the Individuals with Disabilities Education Act ("IDEA") and the California Education Code. Additionally, pursuant to 34 C.F.R. § 300.532(a), Petitioners seek an **expedited** due process hearing for a determination by OAH (see **Issue # 8** below) that Kylo's alleged behaviors identified at the Charter's unlawful manifestation determination review ("MDR") on or around September 24, 2025 were caused by his documented disabilities. Stay put is concurrently being filed in the United States District Court for the Northern District of California along with a complaint for legal violations of Kylo's rights.

Finally, Credo's acts during the relevant statutory period were negligent, unlawful, and violative of several disability and civil rights laws including, but not limited to, Section 504 of the Rehabilitation Act of 1973 ("Section 504") and the Americans with Disabilities Act ("ADA").

## III.    REQUIRED INFORMATION

| | | |
|---|---|---|
| 1. | Student's Name: | Aliera "Kylo" R. Appling |
| 2. | Name(s) of Parent(s): | Gregory Appling (father) Julie Appling (mother) |
| 3. | Address: | 1700 Cooper Road, Sebastopol, CA 95472 |
| 4. | Phone Number: | (415) 637-0784 (father) |
| 5. | Student's Date of Birth: | March 7, 2010 |
| 6. | Student's Grade Level/Age: | 10th grade (age 15) |
| 7. | Student's Primary Language: | English |
| 8. | School of Attendance: | Credo High School |

2

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
*APPLING v. CREDO HIGH SCHOOL*

| 9.  District of Attendance | Credo High School (Charter) |
| --- | --- |

## IV.  PARTIES TO BE NAMED AND SERVED

Credo High School, by and through its Executive Director by e-mail and U.S. Mail:

Andrea Akmenkalns
Credo's Executive Director
Credo High School
1300 Valley House Drive, Ste. 100
Rohnert Park, CA 94928
E-mail: Andrea.Akmenkalns@Credohigh.org

## V.  BACKGROUND AND STATEMENT OF THE FACTS[1]

Kylo (DOB: 03/07/2010) is a 15-year-old student eligible for special education and related services under the categories of Autism and Other Health Impairment ("OHI") pursuant to Cal. Ed. Code § 56026 and 20 U.S.C. § 1401(3).

### a.  Preschool and Early Diagnosis

Since Student's early years, parents reported seeing a child who engaged in limited peer play, rigid/solitary imaginative play, and sensory needs. Student was also diagnosed by his pediatrician with oppositional defiance disorder.

### b.  During Middle School, Student's Stability, Mental Health and Peer Stressors Result in IEP Eligibility and Mental Health Hospitalizations

During Student's 5th grade year (2020-2021 at Gravenstein Elementary School), Student was placed on a Section 504 plan. By 7th grade (2022-2023), an onset of persistent peer-group conflicts and bullying over a friend group started to emerge. This pattern caused Student to withdraw from social activities. By the 8th grade, Student was now having full-fledged panic attacks and suicidal ideations, leading to placement on a Welfare & Institutions Code Section 5150 hold, inpatient treatment, and hospitalizations. These mental-health struggles almost exclusively centered around peer relationships. The situation was so severe that Student had to be placed on Home and Hospital Instruction ("HHI").

---

[1] Background facts give context to the issues and Petitioners allege those claims only that fall within the two-year applicable statute of limitations unless state or federal authority allow for claims beyond the two years. Petitioners reserve the right to amend this complaint.

*REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION*
*APPLING v. CREDO HIGH SCHOOL*

Parents sought out Dr. Lyndsay Dell ("Dr. Dell"), a clinical neuropsychologist, who noted that Student exhibited Autism Spectrum Disorder, depression, ADHD and anxiety. Dr. Dell highlighted what was the start of a pattern of severe mental-health challenges which permeate most of Student's school career to date, including but not limited to intrusive thoughts, emotional impulsivity, low frustration tolerance, and a need for co-regulation and perspective taking work. Dr. Dell reported that Student has a presentation and history that suggested patterns of alexithymia, which are challenges in describing emotions, difficulty differentiating between feelings and bodily sensations, externally oriented thinking and difficulty registering emotions. Dr. Dell stated:

> These tend to manifest as challenges with inhibiting behaviors triggered by strong emotions (emotional impulsiveness, low frustration tolerance, greater emotional excitability), reduced ability to self-soothe or down regulate strong emotions, difficulty refocusing attention from emotionally provocative events, and less developed capacities in choosing alternative emotional responses in line with long-term goal

> An important clinical goal will be continuing to clarify and understand the relationship between Aliera's mood and behavioral symptoms. Mood symptoms and executive control are linked and interactive, for example, big emotional feelings and difficulty controlling them can make it harder to pay attention and learn from experiences, and less developed executive control can make it harder to switch gears, take perspective, and down-regulate emotions

**c. Student Transitioned Back to Comprehensive Environment After Multiple Hospitalizations and HHI-IEP Eligibility.**

In or around January 2024, Student enrolled at Sunridge School (a charter school). The focus was a low re-integration with work on peer connections.

By March 2024, psychoeducational/IEP records documented Autism and OHI as Kylo's eligibility categories due to attention deficit hyperactivity disorder ("ADHD"), along with significant anxiety, depression, executive functioning deficits, social-communication impairments, sensory regulation needs, and emotional dysregulation requiring Educationally Related Mental Health Services ("ERMHS"), functional behavioral interventions, and safety supports. The report highlighted Student's intensive history with mental health almost exclusively around a similar-themed pattern of negative peer interactions resulting from Autism.

Notably, all of these patterns plainly state the function of Student's peer issues are rooted in manifestations of Autism, such as "ideation," inappropriate "verbal" disclosure to peers, intrusive thoughts, perseveration, rigidity, and a sense of control and fairness. These patterns became the crux of Student's ongoing struggles explained below.

The psychoeducational report stated that in spite of intensive interventions during his 6th - 8th grade years, Student still struggled with these patterns of behaviors:

> Her 504 plans at this time were primarily geared at supporting her relationship with peers and less academically. Her summer after seventh grade was reported as extremely difficult with the anxiety of returning to a hostile environment. Aliera was under much stress that shortly before school started, she was hospitalized for one week. Aliera returned to school on a hybrid program both in school and independent online program through Charlie Health, but after several weeks her coping skills were exhausted, and she struggled withs school. Aliera's mental health condition had escalated, and she was presented with the option of residential treatment at John Muir. After another visit to the ER, and inpatient stay at Mills Peninsula she was admitted to Muir Wood where she remained for several months. She returned home in November of 2023 and was on Home and Hospital through December of 2023.

The psychoeducational evaluator stated that while Student presented with Emotional Disturbance, it was overwhelmingly clear that the patterns being seen with peers were the direct result of Student's autism.

It was noted that the speech and language assessment recommended services due to pragmatic language deficits which included fixation on peer actions, yelling, and needing prompting for coping. The school's speech pathologist noted that Student is "fixated on the actions of others," "uninterested in resolving" peer conflicts, and would often fail to reciprocate the emotions (or apologies) from others. The Sunridge speech evaluation documented severe pragmatic impairment by rating scales and teacher narrative: poor regulation with peers, tone and volume problems, fixation, frequent counseling visits, inability to read empathy and apologies, yelling/clicking/grunting, and non-reciprocity—all core social-communication features of Autism that predict inappropriate and dark comments under stress.

Not surprisingly, the offered IEP goals addressed peer relationships, rigidity, and externalizing and internalizing behaviors which permeated through all of Student's schooling. Some of these issues required Student to be sent home due to outward manifestations and vocalizations. For example, one goal was to use "zones of regulation" to address behaviors beyond Student's control. The same goal demonstrated that Student was prone to "over-react." Student was expected to "minimize" his own emotional response to problems and to "describe her own reaction." As part of that IEP, teacher reported that Student "reacts strongly to minor slights," cannot "function in a normal classroom" and cannot "regulate emotions." Student's teacher stated a serious concern given these issues, regarding how Student could "manage" in a "high school" setting in light of the outward issues with negative peer social interactions.

It should be noted that at all times, Credo and its Director of Special Education, Pia Banerjea ("Ms. Banerjea"), had notice of these specific issues because she attended a transition meeting wherein these exact concerns were discussed prior to Student's enrollment at Credo. Ms. Banerjea's subsequent, independent, reckless, and negligent behaviors at IEP meetings and manifestations meetings created hostile environments where the IEP concerns were ignored and deeply caused harm to Student and Student's family, as will be further discussed below.

**d. Another Hospitalization Due to A Pattern of Peer Conflict While Interventions Were Still Not Working**

Despite these interventions, in July 2024, prior to starting high school at Credo, Student was placed at Alta Bates Summit Medical Center for nine days, starting on July 4-13, due to the same pattern of friendship rupture which resulted in serious mental health issues for Student.

Around this time, Student attempted to gain access to a knife in his home. In response, Parents locked up all objects in the home which could be of danger. A therapist note/summary of discharge at Newport Academy, a partial hospitalization treatment, identified working on self-love, social skills, listening, empathy, and conflict resolution.

Again, on or around August 2024, Parents sought out Innovative Behavior Resources to obtain home-based Applied Behavior Support Services. The Clinical Director, Med, BCBA, LBA

*REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION*
*APPLING v. CREDO HIGH SCHOOL*

informed Parents that Student was not mentally "stable" and concerns were raised around the intensity of Student's behaviors, particularly regarding transitioning into high school without triggers. The same clinical director raised concerns around "safety" and especially cautioned the type of interventions to be used which would primarily need to focus on trauma-informed approaches.

**e. Student's Ninth Grade IEP at Credo Included Admissions that Student's Mental Health, Peer Conflicts and Manifestations Were Ongoing Patterns of Peer Struggle. The Transitional IEP and September 2024 IEP Denied Student a FAPE.**

During the transition IEPs, one held in May 2024 and another after enrollment on September 4, 2024 (30-Day IEP meeting), Parents warned Credo that Student's social issues would escalate. Notes indicate that by this time, Student's pattern of peer struggles continued to lead to "feelings of upset and overwhelm." Notes go onto state that the EHRMS counselor reported "They have difficulty with over-sharing sensitive information about past difficulties which have led to discomfort or surprise by others." Parents requested a Functional Behavior Assessment ("FBA") which Credo delayed, only starting assessment in December 2024. This was a denial of FAPE.

**f. Credo Denied FAPE By Offering Inadequate Zoom-Based Speech Services.**

At the May 2024 IEP meeting which Ms. Banerjea attended to discuss Student's transition to high school, Credo offered speech services via Zoom, which Parent noted was completely ineffective for Student. Later, at the September 4, 2024 IEP, services were changed to weekly 1x30 speech services despite Student's severe pragmatic-language challenges. The lack of appropriate levels of in-school support and services denied Student a FAPE. By the September 4, 2024 IEP, Credo admitted it had no speech services other than the inappropriate Zoom services. This denied Student a FAPE. Ultimately, Credo could not and did not locate appropriate in-person speech services to address the pragmatic-language deficits that Student's prior middle school identified and forced parents to accept "consult" with the school's counselor to work on pragmatics. This denied Student access to appropriate speech services and therefore denied him a FAPE.

*REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION*
*APPLING v. CREDO HIGH SCHOOL*

**g.   The 2024 IEP Counseling Services Were Ineffective and Denied Student a FAPE**

Credo was fully aware of Student's history of mental health issues, hospitalizations, and overall struggles with negative peer experiences. Instead of offering EHRMS and appropriately designed services for the intensive levels of mental health support needed, Credo denied a FAPE when it offered woefully inadequate levels of counseling support. Having offered Student 1x45 minutes a week when Credo knew that Student needed more given the history of mental health issues constituted a denial of FAPE.

**h.   Student Suffers an Extreme Peer Meltdown on a School Trip.**

During his ninth-grade year, Student had a very large meltdown surrounded by other children and in spite of the previous above-noted years of intervention, could not be regulated. Student was on the ground, crying, scratching his arms, rocking, and non-responsive to verbal requests from staff to move. After about one or one and a half hour had passed, Staff could not calm Student down and therefore Credo contacted Parents asking them to pick Student up from the field trip.

**i.   The October 2024 IEP Noted Student's Ongoing Pattern of Peer Conflicts, Rigidity, and Vocalizations Manifesting From His Mental Health and Autism.**

At this IEP, Credo noted that Student continued to struggle with negative social interactions and "still causing emotional distress, they struggle to identify the scope/size of the problem and effectively or use appropriate coping tools to regulate." Credo denied the addition of the behavior support hours requested by Parent because Student continued to struggle with regulation and peer relationships. The EHRMS counselor and SLP consultation were added to address social pragmatics.

**j.   October 22, 2024 IEP Amendment**

Critically, at Parent request due to the ongoing pattern of autism-related social problems which strained Student's mental health and hindered his access to school, a perspective-taking goal was added to deal with "difficult social situations" and to "identify what Student originally

8

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
*APPLING v. CREDO HIGH SCHOOL*

misunderstood." The baseline stated that "student responds inappropriately" to social scenarios due to misunderstanding social cues, all hallmarks of Student's autism.

### k. Credo's Speech Assessment Ignored All Areas of Suspected Need, Then Denied FAPE to Student Who Desperately Needed Services.

While the earlier 2024 March report speech and language assessment documented severe pragmatic deficits via caregiver/teacher checklists and a history of dysregulation with peers, Credo's re-evaluation did not re-administer pragmatic rating scales across informants (e.g., CELF Pragmatics Profile/Social Responsiveness/SRS-2), nor did it include naturalistic social samples during known high-risk contexts (unstructured settings, noisy environments, prior known risks of lacking the ability to work in groups, conflict with specific peers and making inappropriate and negative comments across settings) which were documented and known environments for social pragmatic deficits. Instead, it largely relied on one clinic-style session, a brief lunch observation, CASL-2, and CAPs subtests.

Credo's write-up relies almost exclusively on CASL-2 and CAPs performance in a quiet, examiner-led context when it was already well-known that due to Student's inability to generalize, Student could respond in examiner led or 1:1 adequately but lacked the ability to generalize these skills in any meaningful way in negative peer interactions. The assessment then downplayed Student's functioning ("no concerns"), while downplaying: (1) prior very-low ratings, and (2) its own CAPs Paralinguistic Decoding = 25th percentile and qualitative note that Student "dominates the conversation." Those findings are direct evidence of pragmatic weakness that adversely affects peer relationships and conflict resolution.

The report concludes "no SLI eligibility" because standardized language is "average," but eligibility/need for related services can rest on pragmatic impairment that adversely affects educational performance (social participation, behavior, access) even when morpho-syntax/semantics are average. Credo's report does not analyze adverse impact despite ongoing peer conflict and behavior plans that the IEP team admitted were pervasive and impacted Student negatively at school.

9

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
*APPLING v. CREDO HIGH SCHOOL*

As a result, the Credo IEP team denied speech and language services based on a severely flawed evaluation when it knew that Student's Autism affected pragmatic language and moreover continued to be a pervasive problem throughout the Student's day.

**l.    The December 2024 IEP Constituted an Ongoing Denial of FAPE and Ignored Student's Speech and Language Needs.**

At an IEP to review Student's behavior and speech needs, the IEP team reported that Student continued to have serial and significant issues with negative peer conflicts. This report was consistent with Student's history including the above-noted March 2024 middle school speech assessment. However, Ms. Banerjea ignored this and announced on the record that there was "no data" whatsoever, or similar words, which showed that Student's pragmatic deficits existed despite having attended the middle school transition meeting where these deficits and services were discussed and these same identical issues were still at play when the team convened at the December 2024 IEP meeting. Once again, no speech services were offered despite Parents request for direct in-person speech services.

**m.    An Ineffective Behavioral Intervention Plan Was Written Based on a Below-board Functional Behavior Assessment. Nevertheless, the FBA and Behavioral Plan Are Admissions of Student's Patterns, Autism, and Related Struggles Around Peer Conflicts, Inappropriate Thinking, and Commenting.**

By December 18, 2024, a wholly inappropriate FBA was conducted, resulting in a woefully inadequate and ineffective behavior intervention plan was written by Credo's school psychologist, Ryan Pepin ("Mr. Pepin"). Regardless, the FBA's key points still demonstrated key aspects of Student's pattern of struggles:

1. Behaviors of concern include: "Negative peer interaction which may include arguing or making negative comments…."   These behaviors occurred at least twice per week.

2. Since 2023, "He was very reactive and struggled with emotional regulation such that he was not responding to attempts of de-escalation or support from others."

3. Student became fixated on the actions of peers and would become angry, yell, become unaware of his volume and tone at times, and required prompting to use coping strategies. Student struggled to resolve conflicts and started to feel unsafe at school. Student had heightened sensitivity in social interactions which was explained as a

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
*APPLING v. CREDO HIGH SCHOOL*

likely obstacle to the development of close relationships. He was described as quite sensitive in his interactions with others and was quick to harbor strong feelings of resentment because of perceived slights and insults.

4. Student was known to draw "negative peer attention" and "struggled to resolve conflicts," "struggled with regulation" and required interventions with "safe expression of feelings" when engaging with two-way interaction.

5. The interview with a teacher (Dr. Gordon) describes that Student "seems to share dark or negative things" which makes him a target of peers.

6. Teachers reported that Student could have "intensity of negative reactivity to others" which leads to negative interactions. "Kylo also adds extreme or intensive perspectives and seems to be interested in shock value at times." Teachers had to remind Student not to "talk that way" in class.

7. Student would make loud noises toward unliked peers.

8. Student was known to make statements about suicidal ideation, not wanting to live and threat assessments were conducted.

The entire FBA was written without regard for appropriate assessment and appears to have been done without the requisite training for Students like Kylo. For example, the FBA declares the primary function is "loss or perceived loss of social connections (tangible)" and secondarily escape from sensory overload. However, this error is critical because the data and history showed that the functions of Student's behaviors were social-attention/peer-attention, control/justice, or escape/avoidance—all consistent with autism. The FBA avoids accuracy in data so that staff assigned to Student could actually implement the resulting Behavioral Intervention Plan ("BIP"). For example, references are made to "negative comments" or inappropriate comments in class without specifically identifying the types of negative comments with any specificity. Given the robust history of peer relationship issues and the intensive commentary and downward spiral this caused for Student, reactive strategies as written are vague and totally immeasurable, using words like "may include" and "offer distraction."

Critically, given the need for hospitalizations and other interventions that had failed to make any change in Student's peer-related issues and behaviors related to autism, the behavior plan completely fails to look for known warning signs tethered to a tiered, clear response for

**REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION**
*APPLING v. CREDO HIGH SCHOOL*

parents and staff to understand. This did in fact lead to serious failures repeatedly. The FBA is fraught with misleading operational definitions and wholly inadequate functions of behavior which was totally surprising given the breadth of data from other past providers, experts and treatment providers available to Mr. Pepin. Certainly, Mr. Pepin had a duty to evaluate which prior interventions had worked and did not work but failed to do so at all.

**n.  The Resulting BIP Was an Egregious Denial of FAPE.**

The BIP, again, whether implemented or not, was never designed to appropriately address Student's serious needs in mental health and peer relationship struggles. To begin with, the problem behavior is defined vaguely: "Make a comment to a peer or adult that seems intense, inappropriately loud or confrontational." Without an operational definition, educators and those responsible for implementing the BIP cannot take consistent data or identify when to actually provide support.

Equally problematic, not a single person is responsible for implementation. The BIP utilizes "staff should" language. The plan never listed *who* does the frontloading, social-mapping, prompting, or reinforcement; there's no schedule, tracker, or fidelity check.

Given known issues with hospitalizations, threats to self and inappropriate off-putting comments to others, an identified plan step by step calling out how to address safety and reduction of those "intense" vocalizations resulting from student's disability is critical. Student had a known pattern of inappropriate rigidity, sense of justice, misperception around peer relationships that was a constant and resistant to other intensive interventions, yet no safety actions were discussed even when Student had known hospitalizations when entering Credo.

Any meaningful data collection system when developing or implementing the BIP required intensive staff training and data collection in known problematic situations both in groups sessions in class and in non-structured environments. This was totally lacking in every regard.

*REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION*
*APPLING v. CREDO HIGH SCHOOL*

**o.  In July 2025, Student had a Breakdown Caused by Therapy-Prompted Statements Leading to Intensive Thoughts and Homicidal Ideation.**

On July 24, 2025, during a therapy session, Student voiced hypothetical ideation in response to a clinician's prompt. Student was placed in a partial hospital program at Newport Academy from July 17-24, 2025. On July 24, 2025, Student reported to his therapist, Jennifer Lanciault, he wanted to kill 13 individuals, eight classmates from previous schools, and five current classmates at Credo. The Sheriff issued an informational report and coordinated a next-day MST/W&I § 5585 evaluation; there was no emergency custody. On or around July 25, 2025, Kylo was transported to Alta Bates. On or around July 28, Mr. Pepin (Credo's counselor) talked to Parents stating that he wanted to support Kylo's safe return to school. There was a follow-up email confirming same on July 30. That same day, Parents received a call from the School Safety Officer of the Rohnert Park Police Department assigned to Credo. On July 31, Parents were notified that Kylo would be discharged on August 1. On August 4, Kylo was placed at Muir Wood Teen Treatment Centers for outpatient therapy.

Parents implemented home safety measures and promptly informed Credo. Various releases were signed allowing Credo's school psychologist, Mr. Pepin, to speak to all of the required mental-health providers. He admitted later he made no efforts to speak to those providers to ascertain whether any relevant information needed to be obtained.

On August 8, Ms. Banjerjea, sent an e-mail stating as: "Since the safety plan is created for Kylo to access greater support, it will become part of his IEP as part of an amendment IEP. If you agree to have me create this amendment without holding a formal Amendment IEP meeting, I can create it and send it to you, along with the safety plan, for approval and consent signatures."

**p.  Credo Violated Student's Rights by Making Changes to the IEP Without Parent Consent and Engaged in Bad-Faith Delays to Hold an IEP Meeting.**

On August 8, 2025, Ms. Banerjea referenced the Sutter Health summary in an e-mail to create a safety plan to address, among other clear social deficits, "homicidal ideation" towards Credo students. In her e-mail, Ms. Banerjea explained a safety plan was required "for Kylo to access greater support, it will become part of his IEP as part of an amendment IEP." Ms. Banerjea

13

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
***APPLING v. CREDO HIGH SCHOOL***

asked for agreement of this without a meeting for parental consent. At this point, Student had experienced various social/peer issues which triggered Student into a shutdown with inappropriate responses, including but not limited to self-harm, all of which was a well-documented manifestation of Student's disability. This was a point Parents repeatedly raised, essentially begging at the IEPs for social skills to be addressed—but Credo repeatedly denied. On the same day, Parents requested that Credo urgently convene an IEP meeting to discuss the new information and create a FAPE offer based on it. Ms. Banerjea responded she would send out a meeting notice for an "Amendment IEP meeting" referring to the following week to discuss Student's "homicidal ideation" and the amendment for the safety plan.

By August 11, Ms. Banerjea identified the safety plan would be reviewed with Student by Mr. Pepin. Parents were forced to sign off on the addendum when it was received on August 12, 2025 because Ms. Banerjea refused to have an IEP meeting prior to the start of school. The addressed IEP addendum also noted that it was to assist Student with "harm to others," among other things. The warning signs in the plan included "thoughts/images of blood." This list of signs was part of the mood, thoughts, and behaviors that Student's disability could manifest. The purpose of this addendum was to address Student making threats to "kill students."

In spite of these concerning behaviors and a duty to meet as early as possible, Ms. Banerjea delayed the requested IEP until August 18, 2025 at 11:00 a.m. with the purpose of discussing the addendum. This was a denial of FAPE.

**q. Credo Adopts an Ineffective and Woefully Inadequate Safety Plan Resulting in an IEP Addendum Tied to Disability Warning Signs That Denied a FAPE—Then Pivots to Discipline.**

On August 12, 2025, Credo executed a Safety Plan addendum identifying "homicidal ideation (thoughts) and mental graphic images," listing "thoughts/images of blood" as warning signs, and specifying triggers including perceived rudeness and peer rejection, to be addressed through coordinated supports with ERMHS. As stated, the plan was "to support Kylo who has been experiencing challenges accessing coping skills related to mental stress. Kylo was enrolled at Newport Academy in a Partial Hospitalization Program (PHP) from July 17th through July 24th."

14

*REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION*
*APPLING v. CREDO HIGH SCHOOL*

The Safety Plan and the BIP are largely identical in structure, content, and function, with only superficial differences in formatting and audience.

Shared Target Behaviors and Triggers

Both documents identify the same antecedents and environmental triggers:

- Peers with past conflict
- Unstructured settings (lunch, breaks, noisy environments)
- Perceived loss of friendship or social rejection
- Performance evaluation (e.g., PE, group work)
- Overstimulation due to noise or sensory overload

Identical Coping and Replacement Strategies to BIP and Safety plan

Both plans prescribe the same replacement or coping behaviors:

- Using stress-reduction strategies (music, drawing, grounding, breathing, thinking of pets)
- Taking space with adult support
- Frontloading and scripting expected behavior
- Engaging in restorative conversations after peer conflict
- Seeking out safe spaces or trusted adults

The BIP's "Replacement Behaviors" and "Preventive Strategies" explicitly mention these same actions. While the BIP describes behaviors like "makes intense comments to peers," the Safety Plan repeats the same triggers without adjusting for contextual danger versus educational access, showing that neither plan was functionally individualized. Worse, neither plan defines data-based measures, frequency tracking, or success criteria.

**r. Student's August 20, 2025 Behavior Incident**

On August 20, 2025, Parents received a phone call from Mr. Pepin. Notes from the call are as follows:

> *Ryan Pepin, the school counselor. He called to tell us that Kylo is experiencing a worsening of his homicidal thoughts and ideation. He has a persistent vision of a particular student, who he named, with her throat slit lying in a pool of blood. The school is not at this point sending him home. They are updating his safety plan to encourage him to seek out a safe person when he has those thoughts and not discuss them with other students*

15

*(he had previously told a friend). They also alerted the school resource officer since there are now names of students identified.*

On August 20, Kylo was sent home early by Credo. Prior to August 20, Kylo had missed a significant amount of instructional time because he required pull-outs due to the ongoing mental/psychiatric experiences he was experiencing. On August 20, Mr. Pepin sent an e-mail to Parents amending the safety plan but only to identify that there had been an "increase in the homicidal ideation" and that he thought that the mental images had increased with stress based on the triggers reflected in the safety plan.

### s. Credo Sandbags Parents at the August 21, 2025 IEP Meeting By Including a Suspension Inside the IEP.

Credo noticed an "Amendment IEP" meeting without any discussion of a suspension being listed in the agenda items. The purpose initially of this meeting was to discuss the Safety Plan. However, minutes before the meeting, Credo inserted "disciplinary proceedings," then issued a 4.5-day suspension inside the IEP—justifying it as "marking parameters." Parents received the suspension paperwork for the first time at this IEP which is violative of the standard process both for an IEP and for notice of suspension under the U.S. and California Constitutions and the California Education Code. Credo announced that Student would be suspended but would be able to return.

Notably, when the incident happened, the IEP team discussion demonstrates the IEP meeting failed to implement the BIP or the Safety Plan, consider an updated assessment, adequately amend the BIP, Safety Plan, or even discuss the Least Restrictive Environment to address the mental-health issues and Autism-related behaviors.

Parents received "present levels" only minutes before the meeting; the discipline item was added to the agenda at the last minute; and Credo repeatedly said it had not "had all the information," despite signed releases of information and ongoing provider contact.

Notably absent from the narrative were any interventions being employed in the BIP or even per the inappropriate Safety Plan.

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
*APPLING v. CREDO HIGH SCHOOL*

**t.    Credo Refuses to Amend and Fail to Issue a Prior Written Notice Regarding a Parent Request to Amend the IEP / BIP / Safety Plan After Crisis at the August 21, 2025 IEP Meeting.**

At the August 21, 2025 IEP, Parents and their undersigned counsel requested the following IEP amendments: new ERMHS goals; updated BIP; functional reassessment; and possibly a placement change (HHI/Residential). Credo refused to make any amendments, saying they needed "four more days to review" and that "status quo will continue." No written Prior Written Notice ("PWN") followed this refusal. The refusal to amend constitutes an action requiring PWN, since it denied parent-initiated changes to FAPE and placement. Credo's failure to issue written notice violated 34 C.F.R. § 300.503(a)(2) and Cal. Ed. Code § 56500.4(a). The oral promise to "revisit later" is not legally adequate; the written record was required to explain what was refused and why.

**u.    On August 21, 2025, Parents Asked for a Medical Accommodation to be Evaluated by the Huntsman Mental Health Institute.**

On the same day of the IEP, Parent asked for a 504 medical accommodation to be evaluated from the Huntsman Mental Health Institute ("Huntsman"). On or around August 21, Student was approved for pre-admission for a diagnostic medical treatment out of state to Huntsman to assess the nature of Students mental treatment needs. Notice was given to Credo by Parents of this temporary removal and a request for HHI was requested by Parents if feasible. A letter from Muir Wood was provided to Credo stating that Kylo required mental-health treatment.

**v.    Credo's Unilateral Response to Parent Requested HHI.**

Parents' undersigned counsel notified Credo's counsel Debra Sanders, and Parents notified Credo, of the request for HHI. Ms. Banerjea sent the HHI Guidelines, then later sent the following email on August 27, making a unilateral offer as follows: "At this time, we have determined that Kylo's temporary disability* (acute mental health needs - emotional disability) make attendance in the regular day classes impossible or inadvisable." The HHI offer included:

- Instructional Support provided virtually by Paula Cimo Tucker/2x week for 30 minutes, day/time TBD.

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
*APPLING v. CREDO HIGH SCHOOL*

- Individual Counseling services provided virtually by Mr. Pepin, once/week for 30 minutes, day/time TBD.

- All classroom assignments are available via Google Classroom and if any additional materials are needed to complete an assignment, Ms. Cimo will contact you to arrange a mutually convenient way to deliver those materials to Kylo.

**w.  On August 26, 2025, Credo Notices an Unlawful Extension to the Suspension and a Recommendation for Expulsion Violative of California Law.**

Credo's Executive Director, Andrea Akmenkalns ("Ms. Akmenkalns"), without having held a constitutionally required meeting with Parents, unilaterally extended the suspension and recommended Student for expulsion. Despite having already admitted that police were involved and that students were threatened and the SRO and Credo staff were notified, Credo cited to allegedly new "police information" as the basis for this unlawful extension of Student's suspension. There was no such "new" police information. The expulsion hearing date is currently set for October 21, 2025.

**x.  On September 3, 2025, Credo Proceeds with Constructive Disenrollment; However, a California Department of Education Complaint Forces the Reversal of the Disenrollment.**

On September 3, Credo noticed unilateral disenrollment effective September 11, 2025—constituting a *de facto* change of placement. On Wednesday, September 3, 2025 @ 3:31 PM, Ms. Banerjea e-mailed that she decided, unilaterally, to disenroll Kylo from Credo even when she acknowledged that he was receiving temporary mental health treatment in Utah and was entitled to HHI and the email stated as follows:

> *Good afternoon Gregory and Julie:*
>
> *Per your email to us dated August 28th, 2025, Kylo is currently residing in Utah, at Huntsman residential treatment facility. Therefore, they are not currently considered a resident of California for charter school enrollment purposes. As a result, Credo has determined that it is appropriate for Kylo to be disenrolled from Credo at this time. This email serves as prior notice of Credo's intent to disenroll Kylo effective five (5) school days from the date of this notice, on Thursday, September 11, 2025. Notice of Kylo's disenrollment from Credo will be provided to your last known school district of residence, West Sonoma County Unified School District.*

18

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
*APPLING v. CREDO HIGH SCHOOL*

After Parents filed a California Department of Education ("CDE") compliance complaint on September 8, Credo never officially withdrew its disenrollment of Student and instead pushed ahead with an abusive, unlawful and pretextual manifestation determination review ("MDR") meeting. Ms. Banerjea's e-mail was cited in a CDE complaint as discriminatory and against both the California Education Code and federal law.

**y.  Credo Engages in an Abusive, Post-Hoc MDR Process, Prohibiting Participation by Parents' Experts.**

Once the CDE compliance complaint was filed, the IDEA and other education codes were violated, Credo instituted abuses of the MDR process and used it as predetermination to remove Student unilaterally rather than follow the MDR process in accordance with state and federal special-education law**.** On September 9, Credo demanded an MDR meeting within 24 hours for September 10, threatening to proceed without Parents and their experts, and thereafter refused to schedule a Part 2 on a mutually agreed date and time.

**z.  Respondent Omitted and/or Minimized Evidence in the MDR, Even Though All Evidence Pointed to a Finding that the Conduct in Question Was a Manifestation of Student's Disability and that Credo Failed to Implement the BIP and Safety Plan.**

In short, Credo's MDR was sham and egregiously inadequate, as evidenced by Mr. Pepin omissions or attempts to minimize Student's treating therapist's input; the Sheriff's informational context and MST plan; Parents' line-by-line corrections to inaccurate documents; and the already-adopted Safety Plan that addressed the very "warning signs" later disciplined.

Manifestation Prong 1 (Direct/substantial relationship): The exact conduct (graphic/homicidal thoughts, "intense" verbal comments during peer stress) is named in the Safety Plan and FBA/BIP as disability manifestations with defined antecedents and functions.

Manifestation Prong 2 (Failure-to-implement): Required steps (prompt to safe person/space, grounding, forced-choice to quiet area, ERMHS check-in) were not implemented before removal, which by itself compels a manifestation finding.

Credo's Safety Plan, FBA, BIP, IEP goals/services, and the robust history of negative peer conflicts and inappropriate Student responses due to Student's mental health and autism all

concede the same triggers/functions and target behaviors; the Charter cannot re-characterize them as "new" or non-disability-related at discipline time when its earlier attempt to unlawfully remove Student by September 11 was pretext for not wanting to fund Student's needed therapies, residential treatment and other programmatic FAPE needs.

Credo records and notes recite a long history of peer-related misinterpretations, fixation, and strong reactions to perceived slights, requiring prompting to use coping skills; eight restorative meetings were documented.

At the MDR, the Credo team admitted that it did not follow the BIP of 2025, nor did it implement any of the safety plan in response to the August 20, 2025 behaviors.

Mr. Pepin testified that when Student disclosed wanting to kill another student and mentioned a list of names, he (Mr. Pepin) notified local law enforcement and then Parents. He said the school resource officer came to campus and stated that Student could not remain at school due to safety concerns, and that parents were called to pick him up.

- Mr. Pepin characterized these steps as the team's response — essentially, duty-to-warn reporting, police involvement, parental pickup, and exclusion from school. He did not describe any in-school de-escalation, behavioral, or safety-plan interventions that were tried before the removal.

- He further explained that when "the plan was in place," what changed was that "there wasn't really a list that ever surfaced," suggesting that the new information (a concrete list) was what prompted the action. This language shows he viewed the incident as a shift from the summer plan context rather than a continuation of disability-related behavior already identified in the BIP and Safety Plan - anyone who is sufficiently trained in Autism would have clearly seen that the perseverative and rigid behaviors were the result of autism- an extension of and a continuation of Student's disabilities. Mr. Pepin and Ms. Banerjea's conclusory statements evidence not only pre textual ignorance but are wholly problematic and fundamentally ignore Student's long history around these very types of patterns of behaviors vis a vis peers.

The March 12, 2025 BIP already identifies the same behavior patterns that Credo later claimed were "new" when it suspended Student in August 2025. Per Mr. Pepin's own summary and the disciplinary letter read at the meeting, "Kylo informed a peer of his desire to kill another student. In discussion with his counselor, he disclosed that he had made a list of names of those he

*REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION*
*APPLING v. CREDO HIGH SCHOOL*

wanted killed and identified how he would kill them, identifying three students by name… with a knife." The MDR then concluded that this was a "new behavior" not linked to disability.

The BIP predates the August 2025 incident by five months and contains multiple descriptions and strategies that exactly mirror the conduct that triggered the suspension.

| BIP Section | Language in Plan | Connection to August Incident |
|---|---|---|
| **Target Behaviors / Interfering Behaviors** | "Perseverates on perceived unfairness or rejection; becomes fixated on specific peers; verbalizes violent or aggressive imagery; uses dark or morbid language; makes threatening statements when dysregulated." | The suspension arose from perseverative fixation on a peer and violent statements/images (knife, blood). These are directly named BIP target behaviors. |
| **Antecedents / Triggers** | "Peer conflict, teasing, perceived injustice, loud/noisy environments, unstructured times (lunch, passing period, PE), loss of preferred peer, high stress or transition." | The incident occurred after peer conflict and stress tied to relationships— precisely the antecedents identified. |
| **Function of Behavior** | "To communicate distress, seek control or justice when he feels powerless or misunderstood." | His homicidal ideation was an extreme form of the same control-seeking/distress communication pattern described here. |
| **Replacement Skills / FERB** | "Identify rising anxiety; request safe adult; use coping scripts ('I need a break,' 'I feel angry'); use grounding tools (drawing, journaling, music)." | The BIP already trained the team to have Kylo seek a safe person and use grounding tools—identical to the later Safety-Plan instructions that Ryan ignored. |
| **Reactive / Crisis Response** | "Offer space, neutral tone, one-step directions; allow him to draw, journal, or use music; connect with trusted adult; monitor for safety." | These were the exact steps that should have been implemented when Kylo disclosed disturbing images but were not. |

Every core element of the August 2025 incident—peer fixation, violent imagery, threat language, escalation under stress—was foreseen, defined, and planned for in Kylo's March 2025 BIP and then again in the addendum almost substantially identical Safety Plan.

Mr. Pepin's statements that the behavior was "new or different" is flatly contradicted by the BIP's own language, demonstrating that the suspension conduct was a manifestation of Kylo's known disability and that Credo failed to implement its own BIP.

When Credo was on notice in Parents' CDE complaint that its defective notice of unilateral removal failed, it moved in on the MDR meeting to continue to exclude Student to avoid its duty under state and federal law to offer a FAPE.

Likewise, Credo admitted that it failed to implement the safety plan. For example, this is a side-by-side including both the safety plan and the behavior intervention plan:

**Credo – Safety Plan and BIP Implementation Failures**

This chart outlines what the Credo IEP team was required to do under the Student's Safety Plan and Behavior Intervention Plan (BIP) during the behavioral incident in question and at the subsequent IEP and manifestation meetings, compared to what the school actually did. It also identifies the resulting IDEA and California Education Code violations.

| Phase / Trigger Event | What the Safety Plan Required | What the BIP Required | What Credo Actually Did | Violations & Legal Implications |
|---|---|---|---|---|
| 1. Student verbalizes intrusive violent imagery or "graphic thoughts" | Recognize this as a warning sign. Prompt student to seek or speak to a safe person (psychologist, counselor, trusted adult). Provide access to calm space and coping tools such as drawing, music, deep breathing. | Treat as functionally equivalent to anxiety/stress behavior. Implement de-escalation: verbal cue, redirection, scheduled ERMHS check-in. | Staff called law enforcement before any supportive intervention occurred. No safe-person prompt or coping activity implemented prior to removal. | Failure to implement IEP/Safety Plan (34 C.F.R. §300.323(d)); failure to provide positive behavioral supports (§300.324(a)(2)(i)); procedural FAPE violation. |
| 2. Staff perceives "potential danger" or student | Notify psychologist/administrator; do not question or discipline until risk evaluation. Keep student | Antecedent strategy: frontload expectations, maintain | Staff interrogated student in front of others and contacted | Violation of plan protocols; inappropriate reliance on police instead of |

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
*APPLING v. CREDO HIGH SCHOOL*

| references a specific peer | supervised and calm; contact parents after de-escalation. | nonjudgmental tone, provide opportunity to journal/draw. | PD, violating plan procedures. | IEP interventions. |
|---|---|---|---|---|
| 3. During investigation / IEP meeting following behavior | Review triggers and coping strategies; revise if new stressors identified. | Team review after incident; document antecedents and effectiveness of strategies. | IEP team discussed 'review later,' no immediate amendments to Safety Plan or BIP. | Failure to amend IEP/BIP when new data arose (34 C.F.R. §300.324(b)(1)); denial of meaningful parent participation (§300.501). |
| 4. Determining next steps / placement | Continue ERMHS and academic support through home/hospital or structured setting if safety concerns persist. | Maintain educational access; modify environment before exclusion. | Credo suspended and removed student; discussed disenrollment instead of revising placement supports. | Change in placement without manifestation review or PWN (§§300.503, 300.530). |
| 5. Manifestation Determination Meeting | Safety Plan must be reviewed alongside incident data to determine if behavior was disability-related. | Evaluate BIP fidelity—was it followed? If not, supports manifestation finding. | Team failed to acknowledge skipped plan steps, claiming behavior was 'externalizing' and 'new.' | Incorrect manifestation determination; failure-to-implement prong satisfied (§300.530(e)(1)(ii)). |
| 6. Post-meeting obligations | Update Safety Plan and BIP; train staff on new triggers; provide parents updated plan. | Track implementation daily for 10 days post-incident. | No updated Safety Plan until weeks later; parents drafted their own corrections. | Failure to provide updated IEP/PWN; noncompliance with Ed. Code §§56343, 56500.4. |

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
*APPLING v. CREDO HIGH SCHOOL*

Credo's failure to follow its own Safety Plan and BIP procedures before, during, and after the behavioral incident constitutes both procedural and substantive violations of IDEA and California law. These failures support findings of (1) denial of FAPE; (2) improper manifestation determination; and (3) unlawful change of placement without due process.

**aa. Violation of the Mandatory Duty to Include Parent in the MDR Process and Refusal to Review All Relevant Information**

The law specifically provides that a manifestation determination must be made by relevant members of the manifestation determination team "as determined by the parent and the [school district.]" (20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.530(e).)

The IDEA requires that at the meeting, "all relevant information in the student's file, including … any teacher observations, and any relevant information provided by the parents" shall be reviewed, to determine if the conduct was caused by, or had a direct and substantial relationship to the student's disability, or was the direct result of the district's failure to implement the student's IEP. (20 U.S.C. § 1415(k)(1)(E); 34 C.F.R. § 300.530(e)(1).) The statutory list of relevant information to be reviewed is "not exhaustive and may include other relevant information in the child's file." (71 Fed. Reg. 46719 (Aug. 14, 2006).)

At part one of the MDR hearing held on September 24, Credo agreed to a part two meeting to allow for parents and their experts to attend and present information relevant to the manifestation hearing. Credo refused to accommodate parents and their experts and over the course of several emails beginning from the manifestation through October 14, refused to find a mutually agreed upon date so that Parents and their experts can attend. Parents were denied input in part one of the MDR meeting. Mr. Peppin and Ms. Banerjea refused to acknowledge and identify all relevant historical documents and information related to Student's mental health and behavioral issues. These two refusals denied Student a FAPE.

**bb. A Duty to Reassess Student Was Triggered, Yet Respondent Failed to Conduct an Updated Assessment.**

Given the alleged re-emergence and escalation of disability-related ideation and hospitalization-level concerns in July–August 2025, Respondents had a duty to propose and conduct an updated assessment/reevaluation under 34 C.F.R. § 300.303 and Cal. Ed. Code § 56381) to determine current needs, services, and placement—including consideration of ERMHS intensity, FBA/BIP revision, and continuum options. Credo failed to timely offer an assessment plan or conduct such reassessment and, at minimum, failed to meaningfully strengthen the Safety Plan consistent with the new data.

**VII.    ISSUES**[2]

Petitioners reincorporate the facts and allegations as fully set forth herein. The issues here are not meant to waive any of the facts set forth above. The facts are being read in conjunction with the issues for hearing.[3] Petitioners state as follows:

**ISSUE #1:    DURING THE RELEVANT STATUTORY PERIOD, CREDO ISSUED AN UNTIMELY AND INAPPROPRIATE FBA.**

The December 18, 2024 FBA, which the Charter had unjustifiably delayed despite agreeing to it at the September 4, 2024 IEP meeting, was wholly inappropriate as evidenced by the ineffective BIP created by Mr. Pepin. The entire FBA was written without regard for an appropriate assessment and appears to have been done without the requisite training to meet Student's unique needs. The FBA excludes accurate data that was available to Credo staff. Given Student's well-documented history of challenges with peer relationship and the intensive commentary and downward spiral this caused for Student, reactive strategies written into the FBA were vague and immeasurable.

---

[2] Petitioners reserve the right to amend this complaint as set forth by law. Issues pled are only those which fall within the two-year statute of limitations as set forth by state and federal law at 20 U.S.C. § 1400, *et seq.* and Cal. Ed. Code § 56000, *et seq.*

[3] It is intended that this document will be read as a whole and not simply in sections. Therefore, although facts sufficient to raise claims are incorporated in the "ISSUES" section, there may be other, more explicit facts listed above in the "BACKGROUND AND STATEMENT OF FACTS" section.

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
*APPLING v. CREDO HIGH SCHOOL*

Considering Student's need for recurring hospitalizations and other interventions that had failed to make any change in Student's peer-related issues and behaviors related to Autism, the behavior plan completely failed to look for known warning signs tethered to a tiered, clear response for parents and staff to understand. This resulted in severe and repeated failures. The FBA is fraught with misleading operational definitions and wholly inadequate functions of behavior, given the range of data available from Student's past providers and experts. All this data/input was readily available to Mr. Pepin, who he had a duty to evaluate which prior interventions had worked and did not work but failed to do so at all. Credo's failure to implement an appropriate FBA constitutes a denial of FAPE.

**ISSUE #2:**      **DURING THE RELEVANT STATUTORY PERIOD, CREDO ISSUED AN INAPPROPRIATE BIP.**

The March 2025 BIP was entirely inappropriate as it was based on an inappropriate FBA. It was never designed to appropriately address Student's mental-health needs and his challenges with peer relationships. The target behaviors were vaguely defined, excluding operational and clear definitions that Credo staff, educators, or anyone responsible for implementing the BIP could gather consistent and reliable data or appropriately identify when Student needed support. The BIP failed to even list a single person responsible for its implementation. The plan never listed who does the frontloading, social-mapping, prompting, or reinforcement; there was no schedule, tracker, or fidelity check.

Given Credo was at notice of Student's challenges evidenced by their admissions, Student's hospitalizations, threats to self and inappropriate off-putting comments to others, an identified plan step by step calling out how to address safety and reduction of those "intense" vocalizations resulting from student's disability is critical. Student had a known pattern of inappropriate rigidity, sense of justice, misperception around peer relationships that was constant and resistant to other intensive interventions, yet no safety actions were discussed even when Student had known hospitalizations when entering Credo.

Any meaningful data collection system when developing or implementing the BIP required intensive staff training and data collection in known problematic situations both in group sessions in class and in non-structured environments. This was totally lacking in every regard.

**ISSUE #3:**     **DURING THE RELEVANT STATUTORY PERIOD, CREDO ISSUED AN INAPPROPRIATE SPEECH AND LANGUAGE ASSESSMENT.**

The March 2024 speech assessment documented severe pragmatic-language deficits and dysregulation with peers, but Credo's re-evaluation during the 2024-25 school year failed to re-administer pragmatic rating scales across informants or include naturalistic social samples in high-risk contexts where difficulties were known to occur. Instead, it relied mainly on one clinic-style session, a brief lunch observation, and CASL-2 and CAPs subtests conducted in quiet, examiner-led conditions. This approach ignored Student's known difficulty generalizing skills beyond 1:1 settings and downplayed evidence of pragmatic weaknesses affecting peer relationships and conflict resolution. Despite ongoing peer conflict and behavior plans showing adverse impact, the report concluded "no SLI eligibility" based solely on average standardized language scores, without analyzing how pragmatic impairments affected educational performance. As a result, Credo's IEP team denied speech and language services based on a flawed evaluation despite clear evidence that Student's autism-related pragmatic deficits remained pervasive.

**ISSUE #4:**     **DURING THE RELEVANT STATUTORY PERIOD, CREDO FAILED TO OFFER SPEECH SERVICES FOR PRAGMATICS CONSTITUTING A DENIAL OF FAPE.**

At the May 2024 IEP meeting, Credo offered speech services via Zoom, which was known to be ineffective for the Student. By the September 4, 2024 IEP, Credo changed the offer to only one 30-minute weekly session despite the Student's severe pragmatic deficits. Credo also admitted it had no in-person speech services available, forcing the family to accept a counselor "consult" in place of actual speech-language support. This failure to provide direct, appropriate, in-school speech services prevented the Student from receiving the specialized instruction required to address known pragmatic language needs, resulting in a denial of FAPE.

*REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION*
*APPLING v. CREDO HIGH SCHOOL*

**ISSUE #5:      DURING THE RELEVANT STATUTORY PERIOD, CREDO OFFERED INADEQUATE COUNSELING SERVICES WHICH CONSTITUTED A DENIAL OF FAPE.**

As pled above, Credo was fully aware at the 2024 IEP of Student's history of mental health issues, hospitalizations, and overall struggles with negative peer experiences. Instead of offering EHRMS and appropriately designed services for the intensive levels of mental health support needed, Credo denied a FAPE when it offered woefully inadequate levels of counseling support. Having offered Student 1x45 minutes a week when Credo knew that Student needed more given the history of mental health issues constituted a denial of FAPE.

**ISSUE #6:      DURING THE RELEVANT STATUTORY PERIOD, CREDO ISSUED AN INAPPROPRIATE SAFETY PLAN**

On August 12, 2025, Credo implemented a Safety Plan addendum identifying "homicidal ideation (thoughts) and mental graphic images," including "thoughts/images of blood" as warning signs and triggers such as perceived rudeness and peer rejection, to be addressed through ERMHS support. The plan noted that Kylo had difficulty accessing coping skills related to mental stress and had recently attended a Partial Hospitalization Program at Newport Academy from July 17 to July 24. The Safety Plan and BIP were nearly identical in structure, content, and function, differing only in formatting and audience. Both listed the same antecedents, such as peer conflict, unstructured settings, social rejection, performance evaluations, and sensory overstimulation and prescribed the same coping strategies. Although the BIP mentioned behaviors like "makes intense comments to peers," the Safety Plan repeated the same triggers without distinguishing between safety risks and educational access. Neither plan included individualized data-based measures, frequency tracking, or defined success criteria, indicating that both were duplicative and lacked functional individualization.

Credo's handling of the August 12 Safety Plan and BIP constituted a failure of FAPE because the plans were duplicative, non-individualized, and failed to provide meaningful behavioral or emotional support tailored to Kylo's needs.

**ISSUE #7:       DURING THE RELEVANT STATUTORY PERIOD, CREDO DENIED STUDENT A FAPE IN THEIR UNILATERAL CHANGE OF PLACEMENT.**

After the CDE compliance complaint was filed in September 2025, Credo misused the MDR process to predetermine and justify the unilateral removal of Student rather than follow proper state and federal procedures. On September 9, Credo demanded an MDR meeting within 24 hours for September 10, threatened to proceed without the Parents and their experts, and then refused to schedule the second part of the meeting at a mutually agreed date and time. This violation of procedural safeguards and failure to conduct a lawful manifestation determination deprived the Student of the protections guaranteed under the IDEA and resulted in a denial of FAPE.

**ISSUE #8:       EXPEDITED ISSUE: DURING THE RELEVANT STATUTORY PERIOD, CREDO CONDUCTED AN IMPROPER MDR (20 U.S.C. § 1415(K)(1)(E); 34 C.F.R. §§ 300.530(e), 300.532(a).)**

Pursuant to 34 C.F.R. § 300.532(a), Petitioners appeal the September 24, 2025 MDR in which the Charter delayed more than 10 days, only to determine that Kylo's behaviors were not manifestations of his disability despite lacking relevant members as determined by Parents, refusing mutually agreed scheduling, and failing to review all relevant information, including therapist input, Sheriff/MST context, Safety Plan, IEP data, and Parents' corrections.

**ISSUE #9:       DURING THE RELEVANT STATUTORY PERIOD, RESPONDENT DENIED STUDENT HIS PROCEDURAL SAFEGUARDS (20 U.S.C. § 1415; 34 C.F.R. §§ 300.322, 300.503).**

In August 2025, the Charter injected discipline into an IEP without notice, issued and extended suspensions without a lawful suspension conference or PWN, attempted constructive disenrollment effective September 11, 25, and threatened to conduct the MDR without Parents/experts while refusing a mutually available date. These were denials of FAPE.

**ISSUE #10:      DURING THE RELEVANT STATUTORY PERIOD, CREDO DENIED FAPE BY FAILING TO IMPLEMENT IEP/SAFETY PLAN (20 U.S.C. § 1414(D); CAL. ED. CODE § 56345).**

*REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION*
*APPLING v. CREDO HIGH SCHOOL*

Respondents materially failed to implement the Safety Plan and ERMHS by punishing the very warning signs the Plan identified rather than providing agreed supports and coordinated interventions.

**ISSUE #11:    DURING THE RELEVANT STATUTORY PERIOD, CREDO DENIED FAPE BY FAILING TO IMPLEMENT STUDENT'S BIP.**

Credo failed to implement the Student's BIP before, during, and after the August 2025 behavioral incident. Instead of following the required steps, such as recognizing warning signs, prompting Student to use coping strategies, and involving appropriate support staff, Credo called law enforcement without providing any supportive intervention. Staff interrogated the Student and contacted the police in violation of plan procedures and failed to review or update BIP following the incident. The IEP team did not revise the plans when new data emerged, denied meaningful parent participation, and proceeded with suspension and removal instead of maintaining educational access or modifying supports. No timely updates or retraining occurred, and parents were left to draft their own corrections. These failures to implement the BIP constituted procedural and substantive violations of IDEA and California Education Code, resulting in a denial of FAPE.

**ISSUE #12:    DURING THE RELEVANT STATUTORY PERIOD, CREDO DENIED FAPE BY FAILING TO REASSESS / REEVALUATION DUTY (34 C.F.R. § 300.303; CAL. ED. CODE § 56381).**

Respondents failed to propose and conduct an updated assessment plan despite re-emergent, escalated needs (hospitalization-level concerns and therapy-prompted ideation), and failed at minimum to robustly revise the Safety Plan/BIP, denying Parents meaningful participation in data-based decisions.

**ISSUE #13:    DURING THE RELEVANT STATUTORY PERIOD, CALIFORNIA CHARTER/DISCIPLINE VIOLATIONS (CAL. ED. CODE §§ 47605(E)(4), 48900, *ET SEQ.*, 48915).**

Respondents discouraged/attempted disenrollment and re-started expulsion without a valid MDR and while refusing a mutually agreed MDR date—contrary to charter involuntary-removal

safeguards and IDEA discipline supremacy. The expulsion hearing date is currently set for October 21, 2025.

**ISSUE # 14:   THE CHARTER'S ACTS DURING THE RELEVANT STATUTORY PERIOD VIOLATED STUDENT'S RIGHTS UNDER SECTION 504 OF THE REHABILITATION ACT, THE AMERICANS WITH DISABILITIES ACT, AND OTHER RELATED CIVIL RIGHTS STATUTES [4]**

Here, Credo acted in reckless disregard and with deliberate indifference when it failed to appropriately evaluate, accommodate, and place Student during the statutory period. Moreover, Respondent failed to engage in the interactive process when it knew or should have known that Student was denied a FAPE.

These violations are apparent because Credo had notice and significant knowledge that Student struggled due to his disabling conditions and the negligence of the charter. The charter disregarded his rights as a disabled student by ignoring overwhelmingly compelling evidence that he required intensive interventions and appropriate placement, among other things, in order to access his education. The Charter perpetuated Student's decline and, through its intentional or negligent conduct, exacerbated his disabling conditions causing him harm and moreover, his entire family was under duress during this period having witnessed the neglect.

The *de facto* removal to September 11 based on residency was a sham and based on discrimination. Respondents discriminated on the basis of disability by disciplining disability-related behaviors documented in the IEP/Safety Plan and by failing to provide reasonable modifications and services.

**VIII.   PROPOSED REMEDIES[5]**

1.     Reverse/void the MDR; declare any suspensions, disenrollment (effective September 11, 2025), and expulsion referrals null and void; and order reinstatement of educational rights

---

[4] These claims are brought to exhaust; notably, while OAH has no jurisdiction, some federal district courts have required other civil rights statutes to be exhausted.

[5] These are "proposed remedies" and Petitioners reserve the right to amend these remedies as well as facts and issues set forth in the complaint.

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
*APPLING v. CREDO HIGH SCHOOL*

and placement.

2.    Reverse the Charter's September 24, 2025 MDR decision as void and beyond the 10-day period required by statute.

3.    Order compensatory services (including ERMHS counseling and academic tutoring for missed services/instruction), and an independent FBA and BIP by a qualified non-district provider.

4.    Order Charter to correct educational records (Cal. Ed. Code § 49070), expunge all disciplinary entries related to the August 20, 2025 suspension.

5.    Order charter-law corrective actions and monitoring (Cal. Ed. Code § 47605(e)(4)), including SELPA/authorizer monitoring and staff training on MDR law, parent participation, PWN, reassessment duties, and the review-of-all-relevant-information standard (including cross-settings/time).

6.    Attorneys' fees and any further equitable relief under 20 U.S.C. § 1415(i)(3).

7.    Order stay put

8.    Order placement at a residential treatment facility, including all related costs/materials of parent's choice and given the recommendations upon Huntsman's completion of its therapeutic evaluation.

9.    Compensatory educational remedies are requested in consequence of the Charter's failure, throughout the Relevant Statutory Period, to implement specialized instruction and related services designed to appropriately address Student's unique needs. This is both a compensatory and prospective remedy based on the Respondent's denials of FAPE. All related and incidental costs to be reimbursed to Parents and substantive hours for providers will be of Parent choice.

10.   Fully fund speech and language in the areas of pragmatic including all related costs/materials.

11.   Updated academic, emotional, and social assessments by one or more independent educational evaluators to determine specific remediation for Student's unique needs. Providers are to be selected by Parent.

12.   Funding and/or reimbursement for private counseling, emotional support programs, and/or social skills development programs designed to support Student with socialization, pragmatic communication and maintaining appropriate friendships, thereby providing him skills necessary for high school and beyond. All related costs including but not limited to assessments.

13.   Funding and/or reimbursement for a non-District Ph.D.-level BCBA with experience in extinguishing maladaptive behaviors in children similarly situated to Student's to conduct

an FBA and provide necessary feedback, supervision, and monitoring of implemented behavior intervention services and goals.

14. Training for Parents in working with children with ASD as well as attentional, behavioral, and sensory challenges, and reimbursement for any associated travel.

15. Funding for Student to receive post-secondary instruction, counselling and job-related services by a private provider to assist Student's with post-secondary high school options that he needs in order to reach his potential given the emotional toll the Charter's failures have had on him and his parents.

16. Training for Parents in working with children with, autism, ADHD, disruptive behavior disorder, expressive and receptive language delays, as well as behavioral challenges at Charter expense, and reimbursement for any associated travel.

17. 150 hours of training of Charter's staff in conditions warranting reassessment, development of goals for adolescents with behavioral challenges and learning disabilities, the IDEA, IEP process and FAPE.

18. Petitioners request to be deemed "prevailing party" on all issues.

19. Petitioners request to be reimbursed for all reasonable attorneys' fees and costs to the extent provided by law for all equitable remedies to which Student is entitled through this proceeding and for other non-IDEA based statutory claims.

20. For all equitable remedies to which Student is entitled through this proceeding.


Dated: October 14, 2025                              Respectfully submitted,



                                         By: *Mandy G. Leigh*
                                         Mandy G. Leigh
                                         **LEIGH LAW GROUP, P.C.**
                                         870 Market Street, Suite 1157
                                         San Francisco, CA 94102
                                         Telephone: 415-399-9155
                                         Facsimile: 415-795-3733
                                         Email: mleigh@leighlawgroup.com
                                         *Attorney for Petitioners*

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
*APPLING v. CREDO HIGH SCHOOL*

**PROOF OF SERVICE**

***STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO***

I declare that I am employed in the County of San Francisco, State of California. I am over the age of eighteen (18) years and not a party to the within cause. My business address is 582 Market Street, Suite 905, San Francisco, California 94104. On this day, I caused the foregoing Document(s) to be served:

**REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION**

[**X**]     (VIA WEB PORTAL) I caused such document to be uploaded and transmitted via the "Office of Administrative Hearings Secure File Transfer."

[**X**]     (VIA E-MAIL) I caused such document to be transmitted via e-mail to from dtroutman@leighlawgroup.com to Andrea Akmenkalns at the e-mail addresses listed below. The document transmission was successful and complete.

Andrea Akmenkalns
Credo High School
1300 Valley House Drive, Ste. 100
Rohnert Park, CA 94928
E-mail: Andrea.Akmenkalns@Credohigh.org

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct. Executed in Oakland, California, on this date, October 14, 2025.

_____
Damien B. Troutman

***REQUEST FOR EXPEDITED DUE PROCESS HEARING AND MEDIATION***
***APPLING v. CREDO HIGH SCHOOL***



Office of
Administrative
Hearings



**Unlock to save this login** ✕

**Unlock**

# File Upload Confirmation

**The following file(s) have been uploaded successfully:**

1. 2025_10_14_DP Complaint (Appling v. Credo) (Service Copy).pdf

A confirmation email will be sent to you shortly.

Click here to go back to the upload page:

---

Back to Top

Privacy Policy

Accessibility

Contact Us

  

Copyright © 2025 State of California